# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

———————————————

No. 1D2021-0885

———————————————

ANNALIE ORTIZ,

    Appellant,

    v.

WINN-DIXIE, INC., TRAVELERS
INSURANCE, and SEDGWICK
CMS,

    Appellees.

———————————————

On appeal from an order of the Office of the Judges of
Compensation Claims.
Frank J. Clark, Judge of Compensation Claims.

Date of Accident: September 28, 2003.

December 23, 2024

ON MOTION FOR REHEARING

TANENBAUM, J.

The court grants the appellant's motion for rehearing and
substitutes this opinion for the original. We originally affirmed the
final compensation order. Now we set it aside.

\* \* \*

Winn-Dixie, Inc., for years furnished follow-up medical
supervision to Annalie Ortiz under the Florida workers'

compensation statutory regime upon Ortiz's suffering a compensable work-related injury; the injury requiring removal of one of her kidneys; the remedial care that followed having been provided through an authorized urologist to monitor her resultant permanent medical condition.[1] Upon noticing that it had not received a bill from the urologist in over a year, Sedgwick (the servicing agent) concluded that the tolling of the limitation period—tolling that would have started from her last visit to the urologist—had expired, meaning (in Sedgwick's view) the limitation period had run for filing a petition for benefits ("PFB") regarding care for her injured urinary tract. *See* § 440.19(1), Fla. Stat. (barring any PFB that is not "filed within 2 years after the date on which the employee knew or should have known that the injury" was caused by the work). Sedgwick eventually notified Ortiz that it was terminating the authorization of care based on this statute of limitation.

---

[1] In addition to Winn-Dixie, we have two other appellees: Travelers Insurance, which served as Winn-Dixie's carrier to satisfy its statutory obligation to provide benefits under chapter 440, Florida Statutes; and Sedgwick CMS, which managed the claim as Travelers's servicing agent. *See* § 440.13(2)(a), Fla. Stat. ("Subject to the limitations specified elsewhere in this chapter, the employer shall furnish to the employee such medically necessary remedial treatment, care, and attendance for such period as the nature of the injury or the process of recovery may require . . . ."); *see also* § 440.09(1), Fla. Stat. (requiring the employer to "pay compensation or furnish benefits" as set out in chapter 440 "if the employee suffers an accidental compensable injury . . . arising out of work performed in the course and the scope of employment"); § 440.38(1), Fla. Stat. (requiring the employer to "secure the payment of compensation under this chapter"); § 440.41, Fla. Stat. (providing for the regulation of the discharge by the employer's carrier of the employer's "obligations and duties" regarding the liability imposed by chapter 440, treating notice to and knowledge of the employer as notice to and knowledge of the carrier, and providing that "any compensation order, finding, or decision shall be binding upon the carrier in the same manner and to the same extent as upon the employer").

2

Ortiz challenged this termination of care by filing a PFB. Rather than question up front whether the previously tolled two-year limitation period had run at all—let alone whether there was still time remaining in the limitation period when she filed her PFB[2]—she focused on the position Sedgwick was taking: that more than a year had passed since the last day it provided her medical care, in which case the tolling period would have expired and, according to Sedgwick, the statute of limitation at that moment would have completely run with it. In opposition to this position, Ortiz contended she had visited the urologist three more times following the last visit billed to Sedgwick; and, despite those subsequent visits having been billed to her private health insurance, the services provided still fell within the scope of care that had been authorized—each one restarting the one-year tolling period, obviating Sedgwick's basis for terminating the promised medical care supplied on Winn-Dixie's behalf. *See* § 440.19(2), Fla. Stat. (providing that if the employer's carrier "furnish[es] . . . remedial treatment, care, or attendance" upon being notified of the injury or receiving a PFB, the two-year limitation period is tolled for a year).

Following a final hearing, the judge of compensation claims ("JCC") dismissed the PFB as time-barred. The JCC found that Winn-Dixie, Travelers, and Sedgwick had "met their prima facie case to establish the Statute of Limitations defense," the JCC basing that determination entirely on the appellees' statement in response to the PFB that the "[c]laim is barred by the statute of limitations," presumably because it was obvious that more than two years had passed between when Ortiz suffered her workplace injury in 2003 and when Ortiz filed her PFB in 2020. It also was undisputed, though, that Winn-Dixie had provided medical care in connection with that injury, but the JCC did not assess to what extent the limitation period had been tolled because of that provision of care—instead simply assuming that when the tolling

---

[2] In the concurring opinion that follows, the majority author writes for himself to explain how, in his view, this practice of not addressing the two-year limitations period overlooks the supreme court's clear direction on how to apply "tolling" in any statute-of-limitation context—including this one.

period expired—the limitation period necessarily would have run to the end along with it, making any PFB on the kidney injury time-barred. Holding aside the extent to which the original two-year period might have been tolled—a question we need not reach for this disposition—Ortiz irrefutably established, through the medical and billing records, that her three subsequent visits counted as Winn-Dixie's provision of care, further extending the one-year tolling period. Winn-Dixie's limitation defense having been conclusively avoided, the JCC failed to draw the correct legal conclusion from that evidence. The JCC's dismissal is unsupported by the record and the law, so we must set it aside.

I

While working at a Naples Winn-Dixie in 2003, Ortiz tripped and fell, the box she was carrying hitting her right side, causing internal injury. Emergency medical services treated her on site and then transported her to the emergency room at a hospital known at the time as Cleveland Clinic, where she was further treated. She was sent home but received follow-up care through doctors at Cleveland Clinic, her injury ultimately requiring the removal of her right kidney (a procedure known as a nephrectomy) later that same year. Winn-Dixie did not dispute compensability for this injury and authorized long-term remedial care in the form of annual "kidney follow-ups" with a urologist, more frequent visits being allowed if Ortiz needed them.[3] *Cf.* § 440.13(2)(a), Fla. Stat. (requiring an employer to "furnish to the employee such medically necessary remedial treatment, care, and attendance for such period as the nature of the injury or the process of recovery may

---

[3] The kidneys, two organs part of the urinary tract, filter the blood and excrete "end-products of body metabolism in the form of urine." W.A. NEWMAN DORLAND, DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 943, 1860 (29th ed. 2000) (defining "kidney" and "urinary tract"); *cf. id.* 1781 (defining "urinary system" in terms of "the organs concerned in the secretion of urine"). The workplace injury, then, was to one of Ortiz's kidneys *as part of* her urinary tract or system, the removal of one then leaving the tract or system in a permanently diminished, but still functional, condition.

4

require"); *Tower Chem. Co. v. Hubbard*, 527 So. 2d 886, 889–90 (Fla. 1st DCA 1988) (agreeing that "follow-up visits" to provide "ongoing medical supervision for a permanent medical condition caused by [an] industrial accident," authorized and paid for by the employer, constituted the provision of "remedial attention" that restarted the two-year statute of limitation under the pre-1994 version of section 440.19, Florida Statutes); *McNeilly v. Farm Stores, Inc.*, 553 So. 2d 1279, 1280–81 (Fla. 1st DCA 1989) (noting that "so long as a doctor is authorized to provide follow-up care, and visits to the doctor for continuing supervision and evaluation for possible change in treatment are reasonably necessary from a medical standpoint, such visits constitute 'remedial attention' under the [prior version of the] limitations statute" (citing *Tower Chem. Co.*, 527 So. 2d at 890)).

It could be inferred from Ortiz's testimony (and Sedgwick's willingness to consistently pay for her medical care with a urologist over the years) that she was under continuous long-term medical monitoring with the doctors at Cleveland Clinic until she switched to Dr. Marvin Young, Ortiz's authorized provider for this remedial care starting in 2015. By January 2019, Ortiz had attended eight appointments with Dr. Young, all paid for by Sedgwick. The reason for each visit varied slightly, those reasons including the authorized annual check-ups; but also including visits as needed to address complaints for her recurrent urinary tract infections ("UTIs"), dysuria (painful urination),[4] and cystitis (bladder inflammation).[5] Indeed, the January 2019 appointment was a follow-up to July 2018 visits that had led to her being monitored for both the recurrent UTIs and dysuria. She was asymptomatic by the January 2019 appointment but nevertheless told by Dr. Young to continue with probiotics. According to the medical and billing records submitted to the JCC, between 2015 and January 2019, those earlier appointments consistently included treatment or follow-up for UTIs—or assessment of symptoms consistent with a UTI.

---

[4] *See* W.A. NEWMAN DORLAND, DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 560 (29th ed. 2000) (defining "dysuria").

[5] *See id.* at 449 (defining "cystitis").

When Ortiz visited Dr. Young on August 1, 2019, she again was complaining of burning urination, expressing concern that a prior UTI still had not fully resolved (presumably, not having resolved since her prior appointment, which itself was a follow-up on her recurrent UTI). Ortiz provided further explanation for this in her testimony, stating: "I was having a urinary tract infection that was not getting better, and I thought something was wrong with [her remaining] kidney." During this August 1 visit, Dr. Young told her to continue taking the medication he had previously prescribed her for UTIs, a problem, according to her testimony, Ortiz did not have until after the 2003 work accident at Winn-Dixie. Dr. Young billed this encounter—like he had in the past for similar complaints going back to 2015 (and paid for by Sedgwick)—as an office visit and urinalysis, yet he sent the bill this time to Ortiz's personal health insurance.

Ortiz's deposition testimony described her interaction with the office this way:

Q And why did you use your health insurance?

A Because they told me it has to be submitted to my health insurance, not to my workman's comp.

Q Who told you that?

A The front desk. They said the doctor had instructed that.

Q Did they tell you why other than the doctor instructed you?

A No, not really. They just said it has to be -- has to go through private insurance.

Q Was this the first time they ever said that to you?

A Back in 2019, I would say so.

Q Okay. So you said that happened again in March of this year?

A Yes. They billed my private insurance again in March of this year.

Q And did you ask them at that time, why they were billing your primary care?

A They said the workman's comp authorization was not done . . . by the time.

Like the August 1, 2019, visit, during the next two visits, Ortiz received an evaluation or treatment from her authorized provider for a condition or issue for which Sedgwick previously had paid as part of the care being provided for the lost kidney. On August 12, 2019, she presented with the same complaint, and the encounter was billed once again as an office visit and urinalysis. Then, on April 7, 2020, Ortiz returned to discuss the "renal ultrasound and basic metabolic panel" that had been ordered based on her history of recurrent UTIs. This encounter also was billed as an office visit, with an indication that an antibiotic was prescribed for Ortiz's UTI history.

Not having received any communication from Dr. Young's office since the contact about the January 2019 appointment, Sedgwick initiated contact with the office in May 2020. Sedgwick inquired about any recent dates of service and requested accompanying notes. The doctor's office responded by sending records regarding an appointment Ortiz attended on April 7, 2020, more than a year following the January 2019 visit that Sedgwick had last covered. The following month, Sedgwick requested information related to any additional appointments Ortiz may have had, and Dr. Young's office advised that Ortiz had also been seen on August 1, 2019, and August 12, 2019—appointments that Sedgwick previously had not paid for. Notably, the adjuster for Sedgwick testified in a deposition that she did not ask Dr. Young for his notes of Ortiz's visits in August to see what she had been treated for.

If the adjuster had asked for those notes, she would have seen the same treatment that the E/C had been paying for since 2015— recurrent UTIs and dysuria. Indeed, the records make clear that as of January 2019, Sedgwick had considered visits in connection with Ortiz's complaints about her urinary tract—of which her

7

remaining kidney was a part, the tract itself no longer fully intact because one kidney had been removed following the accident—as part of the permanent care it had accepted as related to her permanent injury. Note that before and after the January 2019 appointment, Dr. Young routinely evaluated and treated Ortiz for both dysuria and UTIs, the latter having been acknowledged by Dr. Young in his notes as being recurrent for years. All three of the appointments that *Ortiz's* insurance paid for—appointments Sedgwick later refused because of the statute of limitation—appeared in the record to be nearly identical to the previous ones just described that Sedgwick authorized and paid for nearly a decade.

Despite all this, more than two months later, on August 7, 2020, Sedgwick filed a notice of denial of benefits, effectively deauthorizing Dr. Young, claiming the limitation period expired on January 29, 2020. On August 26, 2020, Ortiz filed a PFB seeking authorization, provision, and scheduling of an appointment with Dr. Young. Sedgwick responded, asserting in part that the PFB was barred by the time limitation set out in section 440.19.

At the final hearing, only Ortiz testified in person. Medical and billing records and depositions otherwise were simply submitted for consideration by the JCC, the medical records including narratives of why Ortiz was seeing Dr. Young and the evaluations or treatments that were provided in response; the billing records showing what both Sedgwick and private insurance paid for from 2015 through 2020. Denying Ortiz's claim, the JCC concluded Winn-Dixie had sufficiently demonstrated a limitation defense, focusing exclusively on the question whether the one-year tolling period provided by section 440.19(2) (ostensibly running from the January 29, 2019, visit) had expired before Winn-Dixie provided further care again through Dr. Young—in essence equating the expiration of the one-year tolling period with the running of the entire two-year limitation period.

The JCC blamed Ortiz:

I find [Ortiz] knew [Winn-Dixie] did not "furnish" the care she received on August 1, 2019, August 12, 2019, or April 7, 2020 because she provided Dr. Young's office with her health insurance information and *confessed* she was told

the doctor had "instructed" his staff to use the health insurance as opposed to billing [Sedgwick].

(emphasis supplied). According to the order, Ortiz was "aware that Dr. Young billed her health insurance for those visits, and she *facilitated* it by providing the doctor's office with her health insurance information *without questioning their need for it*." (emphases supplied). The JCC concluded Ortiz "cannot now argue those visits were compensable, nor that they should have been compensable, in light of the fact that she was *content* to allow the charges to be covered by her health insurance at the time." (emphasis supplied).

For the most part, the JCC conducted a record review in determining whether Ortiz's PFB was time-barred—Ortiz having testified in person only briefly, and not with respect to any fact in dispute; the rest of the evidence having been medical records and depositions. Our "vantage point" on appeal, then, "is not inferior to that of the JCC" in assessing the evidence and its probity. *Hidden Harbor Boatworks v. Williams*, 566 So. 2d 595, 596 (Fla. 1st DCA 1990); *Severini v. Pan Am. Beauty Sch., Inc.*, 557 So. 2d 896, 897 (Fla. 1st DCA 1990) (same); *cf. Mendivil v. Tampa Envelope Mfg. Co.*, 233 So. 2d 5, 6 (Fla. 1970) ("It should be noted that All evidence was submitted by deposition. The industrial judge did not personally see any of the witnesses. The Full Commission was, therefore, in as good a position to evaluate the credibility of witnesses and weigh the evidence as was the industrial judge."). The pertinent facts also are not in dispute. Our review of the JCC's application of section 440.19 to those facts is *de novo*. *See McBride v. Pratt & Whitney*, 909 So. 2d 386, 387 (Fla. 1st DCA 2005) ("The outcome of this appeal turns on our interpretation of the applicable statute of limitations, found in section 440.19, Florida Statutes (Supp.1994). Accordingly, our standard of review is *de novo*."); *Airey v. Wal–Mart,* 24 So. 3d 1264, 1265 (Fla. 1st DCA 2009) (reviewing JCC's dismissal of PFB as time-barred *de novo* where the pertinent facts were not in dispute, making the issue "one purely of law"); *see also McKenzie v. Mental Health Care, Inc./Summit Claims Ctr.*, 43 So. 3d 767, 768 (Fla. 1st DCA 2010) (noting that review is *de novo* when an issue requires interpretation and application of a statute). We conclude the JCC

9

misapplied the limitation and tolling provisions found in section 440.19, as we now explain.

## II

Typically, and as with any statute of limitation, under the one found in section 440.19(1), the employer or its carrier bears the burden of raising the statute of limitation as a defense, indeed waiving the defense unless it "advances the defense . . . in its initial response to the petition for benefits." § 440.19(4), Fla. Stat.; *see Palmer v. McKesson Corp.*, 7 So. 3d 561, 563 (Fla. 1st DCA 2009) ("Because running of the statute of limitations is an affirmative defense, the employer . . . had the burden of raising that defense and proving that the petitions for benefits were untimely pursuant to section 440.19(1)."). Also, like with any statute of limitation, the employee—as proponent of the claim—bears the burden of proving avoidance of that defense. *See Palmer*, 7 So. 3d at 563–64 (stating that "where a workers' compensation claimant seeks to extend or avoid the statute of limitations by operation of section 440.19(2), he or she bears the burden of establishing the exception"). The limitation defense being properly and timely raised; Ortiz having argued tolling as an avoidance; there being records and testimony in evidence before the JCC that indicate some manner of tolling; the facts material to the question of tolling not being in apparent dispute—this essentially being a record-review case before the JCC—whether one side's burden or the other's was met is not the legal question we must address in this appeal. Instead, we look at how the JCC applied the law to those facts before he concluded Ortiz's PFB was time-barred.

We conclude from this record that the August 2019 and April 2020 visits constituted the furnishing of remedial treatment and care, each one further tolling the limitation period up to the point when the PFB was filed. We also reject the appellees' argument that it was *Ortiz*, and not they, who bore the burden of proving "compensability" of her UTI—of showing that her compensable injury was the major contributing cause of it. Yes, Ortiz's claim focused on the tolling of the statute, but even in that context, she did not have to raise or "re-prove" compensability.

There are a few facts we cannot overlook. First, the carrier long ago accepted compensability of Ortiz's kidney injury, even

10

stipulating to that compensability in this case. Second, the carrier indisputably treated that injury as permanent—the carrier authorizing follow-up visits, for an indeterminate duration, with a urologist as needed to monitor for changes in her condition that may necessitate further treatment related to the compensable injury. Third, Sedgwick in the past paid for, and essentially accepted, Ortiz's visits to Dr. Young with UTI and dysuria complaints, as well as follow-up visits to assess his prescribed treatment for those complaints. With these facts as the backdrop, we see no meaningful difference between the visits with Dr. Young in August 2019 and April 2020 that Sedgwick *did not* pay for and the years' worth of visits that it did.

Bear in mind the point we made in the margin at the beginning. The kidneys are part of the urinary tract. While the appellees stipulated to the compensable injury as being the surgically removed right kidney, there realistically would be no need to medically monitor something that is no longer there. The ongoing medical attention with a urologist that Sedgwick authorized had to have been focused, then, on the permanent medical condition of the remaining components of the urinary tract the kidney loss left behind. That authorization comported with the policy behind the Workers' Compensation Law: "to indefinitely preserve on a continuing basis the employer's obligation to provide reasonably necessary remedial treatment for permanent medical conditions," which "most assuredly can . . . consist of continuing medical supervision involving the physician's examination from time to time, evaluation of claimant's condition, and recommendations for continuing or changing" existing treatment or activities. *Tower Chem. Co.*, 527 So. 2d at 889–90 (explaining that "seeing [an authorized doctor] as part of his ongoing medical supervision for a permanent medical condition caused by the industrial accident" is "remedial attention," as the term was used in a predecessor statute). Sedgwick's payment of the UTI and dysuria visits before 2019 constituted its furnishing of care for Ortiz's compensable injury, in the process accepting those types of visits as "reasonably necessary to [Dr. Young's] on-going medical attention" that Sedgwick had agreed to provide. *Id.* at 889; *cf. City of Orlando v. Blackburn*, 519 So. 2d 1017, 1018 (Fla. 1st DCA 1987) (construing "remedial treatment, care and attendance" to treatment that "is not curative but which nevertheless mitigates

the conditions or effects of the injury"); *McNeilly*, 553 So. 2d at 1280–81 (noting "that, so long as a doctor is authorized to provide follow-up care, and visits to the doctor for continuing supervision and evaluation for possible change in treatment are reasonably necessary from a medical standpoint, such visits constitute 'remedial attention' under the limitations statute [under its former iteration]" (citing *Tower Chem. Co.,* 527 So. 2d at 890)).

As in *Tower Chemical Company v. Hubbard*, here Sedgwick "knew [Dr. Young] would provide remedial attention from time to time, for it had authorized [him] to do so," including visits to Dr. Young for complaints of conditions pertaining to the remainder of Ortiz's urinary tract; and Sedgwick had done nothing (at least not on the record) to "deauthorize" Dr. Young for those types of visits by the time of Ortiz's August 2019 and April 2020 visits. *Tower Chem. Co.*, 527 So. 2d at 890. There is no evidence in the record that Sedgwick had communicated any such deauthorization or limitation to Ortiz before any of those visits. We can infer from the medical records showing Ortiz's at-least-once-a-year visits that she thought doing so was necessary to renew the one-year tolling period and "preserve the right to future benefits." *Cf. Mahoney v. Sears, Roebuck & Co.*, 438 So. 2d 174, 174 (Fla. 1st DCA 1983). So the tolling question in this case is not a matter of whether Ortiz failed to visit Dr. Young at all within a year's time, or whether she visited a new, unauthorized physician, or whether she sought treatment for a new body part (*i.e.*, a new injury, the compensability of which being undetermined).

The contested visits in 2019 and 2020 constituted the same furnishment of "medically necessary remedial treatment [and] care" that Sedgwick previously had paid for. The stipulation to compensability of the surgically removed kidney (and the permanent condition of the urinary tract implicitly acknowledged by the carrier to have been left behind in the kidney's absence) "does little in limiting [the carrier's] area of responsibility, nor does it give [Ortiz] guidelines as to what treatment [s]he should be requesting from" Sedgwick. *See Jackson v. Merit Elec.*, 37 So. 3d 381, 383 (Fla. 1st DCA 2010); *see also Meehan v. Orange Cnty. Data & Appraisals*, 272 So. 2d 458, 462 (Fla. 1st DCA 2019) (noting that "the conditions and symptoms for which the E/C accepted responsibility continue to be experienced by the Claimant"). The

appellees did not limit their acceptance of compensability for the kidney to any set of symptoms or diagnoses. This is significant, especially given Sedgwick's payment for evaluations and care for a variety of symptoms and diagnoses tied to the urinary tract generally. *Cf. Meehan*, 272 So. 3d at 462 (noting "legal significance" of "broad stipulation" of compensability, which was for illness stemming from the workplace and did not "specify [particular] conditions," and not allowing the carrier to "escape its acceptance of compensability with an argument of misdiagnosis," where the "symptoms have not substantially changed since the" accidental injury, symptoms "for which the E/C accepted responsibility").

The burden before the JCC in this case, then, was on the appellees "to provide medical evidence that the causal connection between" Ortiz's "compensable [kidney] injury and the requested treatment [in August 2019 and April 2020] was broken"—"that the requested treatment was due to a condition unrelated to the injury which [the appellees] had accepted as compensable." *See Jackson*, 37 So. 3d at 383 (explaining that because the parties stipulated to a back injury as being compensable, the claimant "met his initial burden of proof to establish entitlement to the requested treatment, as it was not disputed that the treatment was for the back"); *Sanchez v. YRC, Inc.*, 304 So. 3d 358, 362 (Fla. 1st DCA 2020) (observing that "[a]lthough a specific diagnosis *could* establish the parameters of an injury accepted as compensable, the E/SA presented *no evidence of the acceptance of a specific diagnosis for this admittedly compensable injury*"; and evidence of a later diagnosis did not prove that the diagnosis was not part of the injury accepted as compensable, the carrier failing to present "medical evidence suggesting that the degenerative condition here did not exist [at the time of the stipulation] or could not be the natural progression of the accepted injury" (emphases supplied)); *see generally Engler v. Am. Friends of Hebrew Univ.*, 18 So. 3d 613, 614 (Fla. 1st DCA 2009) ("Once compensability is established, an E/C can no longer contest that the accident is the MCC of the injuries at issue. It can only contest the connection between a claimant's need for specific treatment or benefits, and the industrial accident."); *Meehan*, 272 So. 3d at 461 (explaining that once compensability of an injury is accepted, the carrier has the burden of demonstrating "the requested treatment was due to a

condition unrelated to the injury which the E/C had accepted as compensable").

That the relationship between the later requested care and the compensable injury arises as an issue in a statutory limitation context does not alter this burden. Otherwise, the carrier could shift this burden simply by citing the statute of limitation as the basis for deauthorizing care it once provided, as Sedgwick did here. *Cf. Meehan*, 272 So. 3d at 461 ("By the E/C's stipulation of compensability, the Claimant was excused of the burden to reestablish causation."). Because Ortiz submitted evidence demonstrating the similarity between the care Sedgwick had paid for through January 2019 and the care she sought in August 2019 and April 2020, the appellees had to submit evidence showing "a break in causation"—that the evaluation and treatment of Ortiz's UTIs and dysuria no longer were related to the loss of her kidney, the injury itself having been accepted as compensable. *See Sanchez*, 304 So. 3d at 363. No such evidence appears in the record that was before the JCC.[6]

Dr. Young's decision to bill Ortiz's personal insurance for the three contested visits does not alter this analysis. It was not for Dr. Young to decide whether the visits for evaluation of Ortiz's UTI or dysuria complaints fit within Sedgwick's authorization. This court repeatedly has held that who gets billed has no legal bearing on the tolling question. *See Seamco Labs., Inc. v. Pearson*, 424 So. 2d 898, 900 (Fla. 1st DCA 1982) ("It is the remedial treatment that tolls the statute, not the report [or billing] of the treatment."); *McNeilly*, 553 So. 2d at 1280–81 ("The fact that McNeilly paid for the visit personally is also irrelevant, in that the significant event is the rendition of remedial treatment before the expiration of the two year period, and not the payment of the bill therefor."); *Sol Dale Bldgs., Inc. v. Schweickert*, 656 So. 2d 606, 609 (Fla. 1st DCA 1995) ("This responsibility cannot be shifted to the claimant. We reiterate, as we held in *McNeilly* and *Seamco,* that it is the

---

[6] In fact, the only evidence on the subject came from Ortiz, who testified she returned to see Dr. Young for the same type of care she had received before—Ortiz not having suffered UTIs before her injury.

furnishing of the treatment, not the billing or reporting, that tolls the statute."); *Gilbert v. Pinellas Suncoast Transit Auth.*, 674 So. 2d 818, 822 (Fla. 1st DCA 1996) (holding that because the employee was authorized to return for follow-up care for his compensable injuries, the "continuing evaluation and treatment" for compensable injuries tolled the statute "despite the claimant's failure to request the E/SA to pay for the hospital's services under workers' compensation").

Simply put, it was legal error for the JCC to conclude the three contested visits did not constitute the furnishment of care that tolled the statute regarding Ortiz's kidney injury. The evidence showed all three were of a piece with the care Sedgwick had authorized for years. The appellees failed to present evidence showing something had changed such that Ortiz's recurring complaints *no longer* related to her compensable injury. And the fact that Dr. Young suddenly stopped billing Sedgwick—without any apparent communication to Ortiz from Sedgwick about deauthorization—cannot support the JCC's looking past that failure and dismissing the PFB as time-barred anyway.

\* \* \*

The question before us is whether the three contested visits sufficiently restarted an applicable tolling period. The undisputed record demonstrates that they did, so Ortiz's PFB filed in August 2020 was *not* time-barred. The JCC's final order is not supported by the evidence in the record and is contrary to the law.

SET ASIDE.[7]

---

[7] This disposition, upon issuance of our mandate, renders the order of dismissal a nullity, thereby reopening Ortiz's claim before the JCC. It has the same meaning as "vacate." We use this disposition, rather than "reversed," to reflect our separate authority to review orders of JCCs and other administrative hearing officers. The Office of the Judges of Compensation Claims being in the executive branch, the orders issuing out of that office are matters of administrative law, having effect only within the branch of which it is a part. Unlike our authority to review judgments and other final orders of trial courts within our branch

15

ROBERTS, J., concurs; BILBREY,[8] J., concurs with an opinion; TANENBAUM, J., specially concurs with an opinion for himself.

---

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

---

BILBREY, J., concurring.

I join the majority opinion in full. I write to emphasize that, like this concurring opinion, Judge Tanenbaum's concurring opinion that follows is not the opinion of this court. These concurrences have no precedential value. *See Scott v. Trotti*, 283 So. 3d 340, 345 (Fla. 1st DCA 2018). So, for instance, Judge

---

(which otherwise do have legal effect outside the branch), our authority to review orders of administrative tribunals is purely a function of statute, our review being "judicial review" of administrative action. *See* Art. V, § 4(b)(2), Fla. Const. The Legislature in turn has separately authorized this court to hear "appeals" from JCC orders. *See* § 440.271, Fla. Stat. Even though the Administrative Procedure Act ("APA") does not apply in workers' compensation proceedings, we see no reason not to treat our dispositions in appeals from those proceedings any differently than the dispositions authorized by the Legislature for "judicial review" generally in appeals from administrative proceedings. *See* § 120.68(7), (8), Fla. Stat. (referring to "affirm," "set aside," "remand," "modify," and "ordering" further action as authorized remedies). There are many historical examples of the use of "set aside" found in federal statutes governing judicial review of administrative action, which is probably the genesis of the term as it appears in the Florida APA. *See Developments in the Law: Remedies against the United States and Its Officials*, 70 HARV. L. REV. 827, 903–04 & n.524 (1957) (listing examples).

[8] Judge Bilbrey substituted for Judge Makar, who was recommissioned as a judge of the Fifth District Court of Appeal. Judge Bilbrey has viewed the digital recording of oral argument.

Tanenbaum's conclusion that certain language in *Orange County School Board. v. Best*, 728 So. 2d 1186, 1188 (Fla. 1st DCA 1999), and *Sanchez v. American Airlines*, 169 So. 3d 1197, 1197 (Fla. 1st DCA 2015), about tolling is dicta is not binding on JCCs or a panel of this court considering the issue in the future. His reasoning may be found to be persuasive or may be discarded. The majority opinion correctly does not reach issues that do not need to be decided to resolve the appeal.

TANENBAUM, J., specially concurring.

The conclusion in the compensation order regarding the claim's being time-barred is legally wrong for another reason, one this panel does not formally reach in this case (if only because Ortiz did not assert it before the JCC or here); but one that nevertheless deserves being addressed. Simply put, mathematically, the two-year limitation period could not have expired—thereby barring Ortiz's claim, as the JCC concluded it did—because, based on the JCC's own factual determination, the period *would not have even started*, at the earliest, until January 2019—a period amounting to less than two years before Ortiz filed her PFB.

I

Notwithstanding what has been the common practice (or preference) among counsel and JCCs, here is what the *law* (read: the statute) mandates for the determination of whether a workers' compensation claim is time-barred, given the plain meaning of the term "toll" as it is used in section 440.19, Florida Statutes.

A

The Workers' Compensation Law gives an employee two years to file a petition seeking a benefit stemming from a compensable injury, the two years running from "the date on which [he or she] knew or should have known that the injury or death arose out of work performed in the course and scope of employment." § 440.19(1), Fla. Stat.; *cf.* § 440.192(1), (3), Fla. Stat. (allowing an employee to file "a petition for benefits" to seek "any benefit that is ripe, due, and owing" and permitting a PFB to "contain a claim

for past benefits and continuing benefits in any benefit category," provided the benefits are "in default and ripe, due, and owing on the date the petition is filed"). Section 440.19(1) undoubtedly is a "statute of limitation" for workers' compensation claims. *Cf. Roe v. City Investing/Gen. Dev. Corp.,* 587 So. 2d 1323, 1324 (Fla. 1991) (treating the predecessor provision as a "two-year statute of limitations"); *Cash v. Universal Rivet, Inc.*, 616 So. 2d 446, 447–48 (Fla. 1993) (same); *Medpartners/Diagnostic Clinic Med. Grp., P.A. v. Zenith Ins. Co.*, 23 So. 3d 202, 205 (Fla. 1st DCA 2009) (referencing the Legislature's 1994 revision of section 440.19 to implement "significant substantive changes to the statute of limitations in workers' compensation cases"); *see generally Gaines v. Orange Cnty. Pub. Utils.*, 710 So. 2d 139, 140 (Fla. 1st DCA 1998) (treating revised section 440.19 as a statute of limitation).

There, however, also is a tolling provision, which states as follows:

> Payment of any indemnity benefit or the furnishing of remedial treatment, care, or attendance pursuant to either a notice of injury or a petition for benefits *shall toll the limitations period set forth above for 1 year from the date of such payment*. This tolling period does not apply to the issues of compensability, date of maximum medical improvement, or permanent impairment.

§ 440.19(2), Fla. Stat. (emphasis supplied). "[W]hether a cause of action is time-barred," then, turns on the determination of "the separate and distinct issues of when the action accrued and whether the limitation period was tolled." *Hearndon v. Graham*, 767 So. 2d 1179, 1184 (Fla. 2000). The supreme court continued this point as follows:

> We extrapolate, therefore, that while accrual pertains to the existence of a cause of action which then triggers the running of a statute of limitations, *tolling* focuses directly on limitation periods and *interrupting the running thereof*. That both *accrual and tolling* may be employed to postpone the running of a statute of limitations so that an action would not become time-barred should not cause confusion between these *distinct concepts*.

*Id.* at 1185 (emphases supplied).

The supreme court has been clear on what statutory tolling means: It "*suspend[s] the running of the statute of limitations time clock* until the identified condition is settled." *Hankey v. Yarian*, 755 So. 2d 93, 96 (Fla. 2000) (emphasis supplied); *cf. Hearndon*, 767 So. 2d at 1185 n.2 (noting how this mirrors federal law, tolling being concerned "with the point at which the limitations period begins to run and with the circumstances in which the running of the *limitations period may be suspended*" (emphasis supplied) (internal citations omitted)). In other words, "a tolling provision *interrupts* the running of the statutory limitations period," so the statutory time provided "is not counted against the claimant during" the tolling period. *Hankey*, 755 So. 2d at 97 (emphasis supplied) (quoting *Rothschild v. NME Hosps., Inc.*, 707 So. 2d 952, 953 (Fla. 4th DCA 1998)). Each time a tolling period starts, the statutory limitation "clock stops until the tolling period expires and then begins to run again." *Id.* (quoting *Rothschild*, 707 So. 2d at 953).

And this understanding of what "toll" means is not endemic to its use in one statute; it is the "plain meaning" of the term. *Id.* at 96. Not just that, "the word 'toll' has been *consistently* used by the Legislature and interpreted by the courts to mean 'suspend' when used in a statutory limitation[] context." *Id.* at 97 (emphasis supplied) (looking to meaning of "toll" in the general limitations statute—section 95.051, Florida Statutes—and concluding the Legislature intended for the term "to have the same meaning in section 766.106(4)"); *Hearndon*, 767 So. 2d at 1184–85 (considering the meaning and application of "toll" as used in section 95.051). "Toll," then, must carry the same meaning wherever it appears in a limitation statute, including its usage in section 440.19(2). *Cf. Goldstein v. Acme Concrete Corp.*, 103 So. 2d 202, 204 (Fla. 1958) (assuming that the Legislature "intended certain exact words or exact phrases to mean the same thing" in "both the mechanics' lien statutes . . . and the Workmen's Compensation Act," such that "to the extent that an understanding of one may aid in the interpretation of the other, [the two should] be read and considered together"); *State v. Hearns*, 961 So. 2d 211, 217 (Fla. 2007) ("We have held that where the Legislature uses the exact same words

19

or phrases in two different statutes, we may assume it intended the same meaning to apply." (citing *Goldstein*, 103 So. 2d 202)).

B

There is nothing unique about how the term "toll" appears in the limitation provision of section 440.19—no special definition provided. As the supreme court directs, the term's application to a time-bar determination should be as straightforward in the workers' compensation context as it is in any civil context. The first question to be answered, then, is when did the claim accrue. In clear terms, the two-year limitation period for a workers' compensation claim runs from "the date on which the employee knew or should have known that the *injury* [] arose out of work performed in the course and scope of employment." § 440.19(1), Fla. Stat. (emphasis supplied); *cf. Solar Pane Insulating Glass, Inc. v. Hanssen*, 727 So. 2d 961, 963 (Fla. 1st DCA 1998) ("The limitations period does not begin to run, however, until an injured employee is aware that he or she may be entitled to compensation benefits."). That is the accrual date, and the two-year "time clock" (the metaphor used by the supreme court in *Hankey v. Yarian*) starts running from there.[1]

---

[1] The limitation period, then, is tied to the employee's injury, which makes sense—the accidental injury being the unit of compensability under chapter 440. *Cf.* §440.09(1), Fla. Stat. (requiring employer to "pay compensation or furnish benefits required by this chapter if the employee suffers an *accidental compensable injury* or death arising out of work performed in the course and the scope of employment," and requiring that "the *accidental compensable injury* must be the major contributing cause of any resulting injuries" (emphases supplied)); § 440.192(8), Fla. Stat. (providing that a carrier's failure to deny compensability under section 440.20(4) "is deemed to have accepted the employee's *injuries as compensable*" (emphasis supplied)); § 440.20(4), Fla. Stat. (requiring an employer to "admit or deny compensability within 120 days after the initial provision of compensation or benefits"); *Checkers Rest. v. Wiethoff*, 925 So. 2d 349, 349–50 (Fla. 1st DCA 2006) (distinguishing between compensability (defined as "the occurrence of an industrial accident resulting in injury") and

20

Relevant to this case, section 440.19(2) tolls this running for a period of one year each time the carrier "furnish[es] remedial treatment [or] care" in response "to either a notice of injury or a

"[o]ther issues concerning the worker's entitlement to benefits . . . including the extent of the compensable injury and the causal relationship between the compensable injury and the condition for which the worker seeks benefits"); *Jackson v. Merit Elec.*, 37 So. 3d 381, 383 (Fla. 1st DCA 2010) ("Confusion is also generated by the inexact and conflated use of the terms 'accident' and 'injury.' An accident results in injuries which require treatment. Generally, treatment is not furnished for an accident, but for an injury. Thus, it is not the accident that the treatment must relate to; it is the injury."); *Babahmetovic v. Scan Design Fla. Inc.*, 176 So. 3d 1006, 1008 (Fla. 1st DCA 2015) ("Compensability is a concept used to convey the idea that the Florida Workers' Compensation Law applies; it requires the presence of certain elements described throughout chapter 440 by terms of art such as *accident, injury, arising out of work performed in the course and the scope of employment*." (internal citation omitted)); *id.* ("The JCC is correct that '[t]here must first be a compensable accident and injury before an employee is entitled to any benefit allowed in Chapter 440.'"); *Sierra v. Metro. Protective Servs.*, 188 So. 3d 863, 867 (Fla. 1st DCA 2015) ("Importantly, because medical treatment is usually provided for an injury, not an 'accident,' a declaration that the need for specific medical treatment is not caused in major part by the workplace 'accident' evades *the essential determination of the identity of the compensable injury*." (emphasis supplied)).

There is only one injury relevant to the issue at hand, but it nevertheless stands to reason—based on section 440.19's injury-centric limitation period—that a subsequently discovered or arising injury would carry with it a separate two-year limitation period during which PFBs could be filed (for the determination of entitlement to benefits related to that subsequent injury), the new limitation period running from when the employee knew or should have known of the new injury's causal link with the compensable accident or a previously compensable injury.

petition for benefits."[2] As the supreme court has directed with respect to other statutory tolling provisions, the JCC must count the days between accrual and the day a tolling period starts (*i.e.*, when qualifying treatment or care was furnished) and add to that sum each number of days that elapse between the end of one tolling period and the beginning of another. If the carrier provides a benefit tied to the compensable injury before a one-year tolling period expires, the period restarts without anything being added to the sum of those elapsed days. The final sum of all these elapsed days represents the amount of the statutory limitation period that has run, so subtracting this sum from two years (730 days) yields the number of days remaining in the limitation period for the employee to file a timely PFB.

Next, to determine whether a PFB is time-barred, the JCC easily can figure out the date when the statutory limitation period expires "by adding [the] days . . . remaining in the original two-year limitations period [at the time the last tolling period began] to [] the date when the limitations period [last] began to run again." *Hankey*, 755 So. 2d at 100 n.7; *cf. Tanner v. Hartog*, 618 So. 2d 177, 183–84 (Fla. 1993) (referring to the length of the "remainder of the statute of limitations" when tolling began and adding those remaining days to the end after the tolling expires to determine by when the party had to file suit (internal quotation and citation omitted)); *Hankey*, 755 So. 2d at 99 (referring to times when the limitation period is suspended and when it begins "running again" after expiration of a tolling period); *id.* at 100 n.7 (same).[3] As long as the employee files the PFB related to the injury

_____

[2] "Payment of any indemnity benefit" also starts the tolling period. § 440.19(2), Fla. Stat.

[3] This methodology tracks the "calculation method" set out by the Fourth District, which the supreme court approved in *Hankey*:

> On December 16, 1993, when the alleged medical malpractice occurred, the statute of limitations started to run. On July 7, 1995, when the appellant filed the notice of intent to initiate litigation, 161 days remained until the expiration of the limitations period on December 16, 1995. However, on July 7th, the statute was tolled for 90

triggering the limitation period before the new date, the PFB is not time-barred. This approach ensures an employee is "given the entire two-year period [he or she was] entitled to under the statute to file suit, *not counting the period[s] of suspension.*" *Hankey*, 755 So. 2d at 98 (emphasis supplied); *id.* at 100 n.7.

Practitioners and JCCs must bear in mind the distinction the supreme court makes between a statutory *extension* of a limitation period and a statutory *tolling* period—the former time being "tacked on to the end of the limitations period," the latter having the effect of *suspending* the running of that period, regardless of how long it is. *Id.* at 98; *see also Tanner*, 618 So. 2d at 182 (noting how an extension of a limitation period "is separate and additional to any other tolling period"). This distinction here is key to understanding the significance of the Legislature's addition of the current tolling provision to section 440.19 in 1994.

Before 1994, section 440.19 did not contain an express tolling provision; it used language that effectuated an extension. *Cf.* § 440.19(1)(a), (b), Fla. Stat. (1993) (using the term "toll" only to prohibit any tolling and referring to rights to compensation and remedial care under the law being "barred" if a claim is not filed

---

days until October 7, 1995. On October 7, 1995, the statute began to run again, and 161 days still remained until the expiration of the statute of limitations period.

On October 30, 1995, the appellant "purchased" a ninety-day extension under section 766.104(2). The statute had run 23 days from October 7, 1995, and the 138 days remaining, plus the ninety-day extension, meant that as of October 30th, 228 days remained in the statutory period. On November 17, 1995, when the appellee served the notice to terminate, the remaining time in the limitations period was 228 days less eighteen days from October 30th, or 210 days. Thus, when the appellant filed the complaint on February 6, 1996, some eighty days later, it was well within the statute of limitations period.

*Rothschild*, 707 So. 2d at 953, *approved by Hankey*, 755 So. 2d at 94, 100.

within two years of the injury *or* within two years of the last payment of compensation or provision of care). The statute allowed a claim to be "filed within two years of the last remedial treatment . . . so long as the claim is filed within two years after the last remedial treatment," even if the original two-year limitation period had run. *Roe*, 587 So. 2d at 1325; *cf. Bell v. Com. Carriers*, 603 So. 2d 683, 685 (Fla. 1st DCA 1992) (reading section 440.19 as allowing for "revival" of the limitation period); *Ellis v. Galloway's Inc.*, 794 So. 2d 710, 711 (Fla. 1st DCA 2001) (same). *This all changed* with the Legislature's 1993–94 reforms, which included adding the term "toll" in a new subsection two (quoted above), thereby creating a true tolling period in place of the old extension period recognized and applied by this court. *See* ch. 93-415, § 23, Laws of Fla. With this addition, our court, JCCs, and practitioners are not at liberty to carry on with the practice of considering only whether the one-year tolling period has run and ignoring whether there is still time left in the statutory limitation period. We are all bound to give the term "toll," as it appears in section 440.19, the same meaning and application the supreme court did in *Tanner v. Hartog* and *Hankey*—because that is what the supreme court has directed must happen whenever the term appears in a statutory limitation context. *See Hoffman v. Jones*, 280 So. 2d 431, 434 (Fla. 1973) (noting that district courts "are [] bound to follow the case law set forth by" the supreme court).[4]

---

[4] Twice in the past, by my count, this court has (erroneously) referred to section 440.19(2) as an extension of the two-year period, rather than as the true tolling provision that it clearly is. *See Orange Cnty. Sch. Bd. v. Best*, 728 So. 2d 1186, 1188 (Fla. 1st DCA 1999) (referring to subsection two as having "no practical effect until after the two-year period provided for in section 440.19(1) expires," because the "[p]rovision of medical treatment or indemnity benefits can *extend* the limitations period but cannot shorten it" (emphasis supplied)); *Sanchez v. Am. Airlines*, 169 So. 3d 1197, 1197 (Fla. 1st DCA 2015) ("Subsection (1) of section 440.19 provides generally that a PFB must be filed within two years after the date of injury or it will be barred, and subsection (2) provides that the only events that will *extend* the statute of limitations are the payment of indemnity benefits or the furnishing of medical treatment." (emphasis supplied)). Of course,

## II

Under this straightforward approach to tolling dictated by the supreme court, the finding of the JCC about the appellees' continuous provision of care, by itself, points to a rejection of their time-bar defense. The entire paragraph of the order on this point is as follows:

> There is no dispute regarding the compensability of Claimant's accident. As a result of her work accident Claimant underwent a nephrectomy; her right kidney was removed. EC agrees Marvin Young, M.D., a urologist in Lake Mary, Florida was an authorized treating physician until they denied the claim based on the statute of limitations. *EC furnished Claimant with authorized medical treatment from the date of her accident until January 29, 2019.*

(emphasis supplied). The highlighted text should have been the end of the matter regarding the limitation period. This determination by the JCC meant that under the plain meaning of "toll" as used in section 440.19(2)—and under the supreme court's application of the term in a limitation context—*no days* on the limitation clock could have ticked off before the initial one-year tolling period began, and *no days* could have ticked off due to breaks between one-year tolling periods, by the January 2019

---

these statements cannot be reconciled with the distinction the supreme court made between tolling and extensions in *Tanner* and *Hankey*. At all events, though, these statements are dicta. *See Best*, 728 So. 2d at 1186 ("The question is whether the statute bars a petition for benefits *filed within two years* of an industrial accident where more than a year has elapsed since 'the furnishing of remedial treatment'" (emphasis supplied)); *Sanchez*, 169 So. 3d at 1197 (framing "the narrow question presented in this case [as] whether the payment of attorney's fees to Claimant's counsel— with *no other medical or disability benefits being paid* simultaneously to Claimant and *no PFBs pending*—is sufficient to extend the statute of limitations under subsection 440.19(2)"(emphases supplied)).

provision of care by Dr. Young.[5] If January 29, 2019, marked the beginning of the last one-year tolling period, Ortiz would still have had a full two years remaining in her statutory limitation period to file a PFB when that period expired a year later. By the time she filed the PFB on August 26, 2020,[6] then, only 210 days would have run on the statute, leaving 520 days remaining in the limitation period.[7] On the face of the JCC's own order of dismissal—with its determination, essentially, that there was continuous tolling until January 29, 2020—Ortiz's PFB was not time-barred.

Despite this determination that there had been no break in care for sixteen years—meaning continuous tolling for that length of time—the JCC seemingly dismissed the whole two-year limitation period from consideration as if it had already run: noting it was "axiomatic[:] that [Ortiz's] August 26, 2020 PFB was not filed within two years after her September 28, 2003 accident." I explain above why this approach is not consistent with the law. The panel does not utilize this line of analysis, though—not because it is not valid, but because Ortiz did not raise it. We cannot reach the issue as an alternate (and more direct) basis for setting the order aside. *See Rosier v. State*, 276 So. 3d 403, 406 (Fla. 1st DCA 2019) (en banc) ("For an appellant to raise an issue properly on appeal, he must raise it in the initial brief. Otherwise, issues not raised in the initial brief are considered waived or abandoned." (collecting authority from the supreme court)).

---

[5] This assumes the two-year limitation period for Ortiz's kidney injury triggered the day of her accident, not an unreasonable assumption given the nature of the accident and the blow to her right side, requiring emergency treatment.

[6] This year was a leap year.

[7] The PFB "tolls the statute of limitations as long as it remains pending." *Airey v. Wal-Mart/Sedgwick*, 24 So. 3d 1264, 1265 (Fla. 1st DCA 2009); *see* § 440.19(3), Fla. Stat. (requiring that a PFB meet statutory specificity requirements to toll the limitation period).

To be fair to the JCC, Ortiz also did not argue the two-year limitation period at the final hearing as a basis for rejecting the time-bar defense. And, as it turns out, practitioners have not been seeking an application of the tolling provision in section 440.19(2) the way statutory tolling provisions have been applied nearly everywhere else in Florida civil litigation—indeed, the way the supreme court described in *Tanner* and *Hankey*. Practitioners across the spectrum of the workers' compensation bar seem to have hewed to the one-year-extension approach for quite some time—which the appellees, oddly enough, characterize as "decades of settled law"—despite the 1994 amendment that added the word "toll" in a new section 440.19(2), and despite the supreme court decisions going the other way.

Holding aside the plain meaning of "toll" and the supreme court analysis described above, for a moment; not only is this old approach contrary to the plain meaning of the term "toll"; but it also simply does not make sense. The one-year-extension approach necessarily presumes that the two-year limitation period already has run, so no further inquiry on the amount of time remaining in that period would be warranted. Section 440.19(2), however, *literally* refers to "toll[ing] the limitations period." If the two-year period already has run, what is still being tolled? By the clear terms of this statutory provision, it is the limitation period being *tolled*—nothing else—and an *expired* period obviously could not be tolled, there being nothing left to suspend. Section 440.19(2) does not use the language of extension, so it cannot be read to operate as a reanimation of the moribund period. Logically speaking, then, if the limitation period in fact has *not* expired (because it at varying points has been tolled), it behooves practitioners and JCCs to inquire how much time is left in the period. After all, it is not the tolling period that bars the PFB in the end, but the expiration of the two-year limitation period.

With this being said, the obvious has been ignored for too long. According to supplemental authority submitted by the appellees, JCCs fortunately have been engaging in the tolling-limitation analysis described above since this court's original opinion (which the appellees describe as dicta anyway). Even with the more limited holding now set out by the panel, there is no good reason for the practitioners or JCCs to revert to their old, erroneous ways.

27

No one needs an opinion from this court to know what the law requires in the limitation space. All involved in fact have something better: a statutory term with a plain, well-understood legal meaning in this context, plus supreme court decisions that describe in mathematical detail how that clear term operates in practice.

These supreme court decisions may have been overlooked by the workers' compensation bar and JCCs previously. My hope is that, going forward, practitioners and JCCs will feel empowered by the supreme court decisions I have discussed to continue with their approach of analyzing tolling the way it plainly is meant to be; and was meant to be, starting in 1994: as a suspension of the limitation period—requiring an assessment of the stops and starts impelled by the provision of benefits—before making the final determination of whether the statutorily established *two-year limitation period* has run, rather than just the one-year tolling period.

———————————————

Richard A. Sicking and Mark A. Touby of Touby, Chait & Sicking, P.L., Coral Gables, for Appellant.

William H. Rogner of HR Law, P.A., Orlando, for Appellees.